GEBHARDT, Respondent, vs. HOLMES and another, Appellants. SAME, Appellant, vs. SAME, Respondents.

*October 25—December 5, 1911;*
*April 6—April 23, 1912.*

(1) *Cause of action: Legal wrong: Good faith.* (2) *Special verdict: Change by court: Questions not answered.* (3–17, 23, 25, 26) *Sheriffs: Duties: Liability: Arrest and bail: Custody of prisoner: Jail limits: Escape: Deputies: Nonofficial custodians: Agreement to produce prisoner: Validity: Statutes: Construction.* (18–23, 27) *Conspiracy: When actionable: Lawful acts.* (24) *Foreign statutes: Pleading: Evidence.*

A sheriff having mesne process in a civil action to arrest a defendant, who was a minor, in the presence of the latter and his father, explained the papers, left copies with the latter, and took his promise to produce the son at the sheriff's office at the county seat the next day. Before the time therefor, the father being advised that his son was not in legal custody and was free to depart from the state, in concert with another, who had knowledge of the facts, assisted him to do so. Upon plaintiff obtaining judgment and failing to collect it by execution, he successfully sued the sheriff for damages for a voluntary escape. The latter then sued the two assistants to recoup his loss. The jury found the alleged prisoner did not submit to arrest; hence they omitted to pass upon whether, at the time of the concert, the father's codefendant knew of such a submission. The court changed the finding to the affirmative, refused to grant a new trial as to the codefendant, or pass upon the omitted matter, or require the jury to pass upon whether at the time of the concert defendants knew the son was under arrest or their conduct would injure the sheriff, rendered judgment against the father for the officer's damages, and dismissed the action as to his assistant.

Assuming, without deciding, that there was a submission to arrest, the following are the ruling legal principles:

1. If one commits a legal wrong to another he cannot avoid compensating such other for his actual legal damages because of having acted in good faith.

2. In case of a special verdict respecting two defendants, in circumstances where either or both may be liable, and a negative, resulting in nonliability as to one, which likewise exonerated the other, and so omits to answer a following vital question as to such other, and the court changes the finding as to the controlling question, the cause should not be concluded as to such other without such omitted matter being passed upon.

3. A sheriff having a warrant to arrest and hold to bail, is in duty bound to, with reasonable promptness, arrest the defendant and retain him in official custody until released on bail according to the warrant, or otherwise in due course of law, or by consent of plaintiff.

4. Failure of duty to make the arrest in the circumstances stated, renders the officer liable to the plaintiff for the pecuniary loss sustained.

5. Failure of duty as to retention in official custody, barring disturbance beyond human control, results the same.

6. In case the officer suffers an escape, whether voluntary or involuntary, he is responsible to the plaintiff within the limitations stated.

7. An officer may, at his peril, allow a defendant in arrest under mesne process freedom from official restraint, provided he produces him upon the return day of the writ or time equivalent thereto.

8. If an officer, in the circumstances stated, suspends official custody for any time, whereby he becomes unable to produce the defendant as stated in No. 7, he incurs liability for the legal damage to plaintiff, dischargeable only by payment.

9. A sheriff may entrust execution of a warrant to an official assistant, subject to personal responsibility for that assistant's conduct as if it were his own.

10. An officer having executed a warrant to arrest and hold to bail, by taking the defendant into custody, commits an actionable breach of duty by entrusting, as matter of favor or convenience, the prisoner to nonofficial control.

11. In the circumstances stated in No. 10 the instant official custody of the person is broken, an actionable escape will have occurred.

12. In case of official custody being broken as suggested in the fore-

going, and there being an escape effected, there cannot be a subsequent escape without a new actual arrest.

13. An escape is effected in the circumstances stated, upon the principle that legal custody exists only when the custodian has a right under the warrant to possession of the prisoner.

14. Resulting from the rule stated in No. 13, upon an officer leaving his prisoner with a person having no right under the warrant to possess him, an escape is effected,—an actionable breach of official duty.

15. It being the duty of an officer having a person in custody to maintain the same till terminated by due course of law, an agreement with a nonofficial custodian to produce the prisoner into official custody at some later time, is in violation of law.

16. An agreement in plain violation of law, is void and so unenforceable by judicial remedies, regardless of whether it involves a breach of moral obligation.

17. The statutes, secs. 2697 to 2706, Stats. (1898), governing the proceedings in respect to the execution of a warrant to arrest and hold to bail, and sec. 2712, providing that, if the prisoner after having been arrested shall not have given bail or be produced in due course, the officer shall be deemed guilty of an escape and be, himself, liable as bail, in effect prohibits such officer from allowing his prisoner to go from his official custody except as provided by the written law.

18. In case of an action against one or more persons for damages for their having executed a conspiracy to do a wrongful act, the gist of the action is the damage.

19. If there be no legal wrong in what is done by two or more persons acting in concert, in that if the wrong were done by one it would not be actionable, in general, it is not rendered actionable because of having been done by a combination.

20. The foregoing is the rule where there is no substantive wrong in the combination itself.

21. In case of a consummated combination to breach a contract, the wrong, giving rise to the legal right to damages, is the breaking of the agreement, not the combination.

22. For a comprehensive rule:

"An act legal in itself, in that it does not offend against the criminal law, and the injuries are *damnum absque injuria*, regardless of its violation of moral standards, whether such act be the one perpetrated or the means used to that end, generally, if not the subject of a civil action for damages when done by one person, is not if done by many acting in concert."

23. Where an officer, in breach of his duty, leaves his prisoner in non-official custody under an agreement that the custodian will produce him, the agreement is illegal, therefore void; hence an executed combination to breach it does not constitute a legitimate foundation for an action for damages for conspiracy.

[Syllabus by MARSHALL, J.]

*On rehearing:*

24. A statute of another state, although not pleaded, is admissible in evidence to prove a material fact which is pleaded.
25. Under the Michigan statute (sec. 8912, How. Ann. Stats. 1882) the jail limits in that state are the boundaries of the county in which the jail is situated.
26. At common law and under the Michigan statute (sec. 8919, How. Ann. Stats. 1882) a person arrested on mesne process may be permitted to have jail liberties without bond, at the risk of the officer, and so long as he remains within the jail limits he continues to be in official custody; but if he goes outside of such limits without the consent of the person at whose suit he is under arrest it is an escape.
27. Persons who combine to induce and assist a person to escape and who execute such purpose to the damage of the officer having him in custody, are liable to such officer for the pecuniary loss sustained by him.

APPEALS from a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge. *Affirmed as to one defendant; reversed as to the other.*

Action for loss caused by defendants, acting in concert, aiding in the departure of a person alleged to be in plaintiff's lawful custody as sheriff, from the latter's jurisdiction.

One Kitchen, deputy under plaintiff as sheriff of Cheboygan county, Michigan, had a warrant, issued in a civil action, for the arrest and holding to bail of one George Schoettle, a minor, living with defendant *Eugene Schoettle,* his father, whose residence was in Ohio, but domiciled *in præsenti* in said county. The deputy visited such domicile to execute the warrant, but, instead of taking George into actual custody, he explained to *Mr. Schoettle* the purpose of the visit, exhibited, read the papers to and left copies thereof with him, George

being present, and accepted *Mr. Schoettle's* promise to produce
the boy at the county seat the next morning in consideration
of his being left at home in the meantime. The purpose of
seeking to hold George to bail was to prevent his leaving the
state pending litigation with him and enforce payment of any
judgment which might be rendered against him. The officer
relied on *Mr. Schoettle's* promise and did not serve the papers
other than as aforesaid. He returned that he duly executed
the writ and defendant escaped from custody. According to
the promise, *Mr. Schoettle* took George to Cheboygan, the
county seat, going by the train on which the officer returned,
but did not deliver the boy into the officer's actual custody.
Upon arriving at Cheboygan the officer went directly to his
home, telling *Mr. Schoettle* to have George at the court house
at 9 o'clock a. m. *Mr. Schoettle* then visited a lawyer's office
in company with Thomas Martin to secure legal advice.
While they were there the officer came in and after staying
a while went away to make inquiries respecting proposed bail.
After examining the papers and hearing *Mr. Schoettle's* state-
ment of the case and what had occurred, the lawyer advised
that the writ was void; that George was not in legal custody
and was free to leave the county if he desired. Following
that, Martin and defendant *Holmes,* in aid of *Mr. Schoettle*
and George, took the latter by team to a railroad station out-
side Cheboygan county, where George took a train and left the
state. Such proceedings were thereafter had in the action
against George that the service of papers on him was adjudged
valid and a recovery in due form was had against him for
$5,000 and costs. After due return of execution thereon un-
satisfied, action was commenced against the plaintiff and his
bondsmen for damages for a negligent escape and judgment
was rendered therein against him for $2,000 and costs. The
judgment was affirmed on appeal and paid. Subsequently,
the sheriff commenced this action for damages. The cause

was submitted to a jury resulting in a verdict of which the following is an abridgment:

1. Was the officer, under his writ, authorized to take George Schoettle into his custody? *A.* Yes.

2. Did the officer, when in a position to do so, intend to take George under the writ? *A.* No.

3. If you say Yes to question 2, did the officer personally inform George of such intention?

4. If you say No to question 3, was George so informed before the conference at the law office? *A.* No.

5. Did George submit to custody by the officer? *A.* No.

6. If you say Yes to question 5, did *Holmes* know of such submission before aiding George to leave the state?

7. Did *Mr. Schoettle,* upon the officer's visit to his residence, give such officer reasonable ground to believe George had submitted to arrest? *A.* Yes.

8. If you say Yes to question 7, did the officer rely thereon to plaintiff's injury? *A.* Yes.

The court changed the answer to the second question to Yes, answered the third in the affirmative, changed the answer to the fifth question, and held that, on the undisputed evidence, as to *Mr. Schoettle* at least, George was actually placed under arrest, and that he, in legal effect, submitted thereto. On the verdict as so changed judgment was rendered against *Mr. Schoettle,* but as to defendant *Holmes* the cause was dismissed with costs.

Defendants' counsel moved the court to strike out questions 7 and 8 and the answers thereto and for judgment, which was denied.

Plaintiff's counsel moved for a new trial as to *Holmes,* in case of denial of judgment against him, because the answer to question 6 should not have been made to depend on the fifth question being answered. The court, for want of an answer to question 6 or conclusive evidence in favor of plaintiff in respect thereto, ordered judgment dismissing the case as to

*Holmes,* as before stated, and denied· the motion for a new trial.

Both sides appeal.

For the plaintiff the cause was submitted on the brief of *E. D. Minahan.*

For the defendants there was a brief by *Miller & Reevs,* and oral argument by *S. S. Miller.*

The following opinion was filed December 5, 1911:

MARSHALL, J.    It is conceded that, unless George Schoettle was actually placed under arrest when the officer visited his father's house, and custody, in practical effect, continued down to the time he was assisted out of the sheriff's jurisdiction, there was no cause of action against the appellant *Eugene Schoettle,* and none against his codefendant, *Holmes,* unless he knew there was such custody, or ought to have known thereof, when he aided in the departure.

The point made that *Mr. Schoettle* was not liable if he did not suppose his son was under legal arrest at the time of the departure, and that the court erred in failing to submit questions on that subject, is not well taken.    The real test is, Did *Mr. Schoettle,* in the legal sense, commit a wrong to plaintiff in assisting his son to leave the sheriff's jurisdiction?    If so, he cannot escape responsibility, as to measurable pecuniary loss suffered, because of ignorance or want of intent to injure. Tort cases, in the civil aspect, do not depend on intent to injure, however that element may figure in the criminal aspect. Neither, in such cases, can the actual damages be mitigated or justified by elements of good faith.    That rule, in general, has often been declared and applied here.    *Wilson v. Young,* 31 Wis. 574; *Fenelon v. Butts,* 53 Wis. 344, 10 N. W. 501; *Grace v. Dempsey,* 75 Wis. 313, 43 N. W. 1127; *Pendleton v. Beyer,* 94 Wis. 31, 68 N. W. 415; *Candrian v. Miller,* 98 Wis. 164, 73 N. W. 1004.    The rule, in brief, is this: He who is damnified by the wrong of another, regardless of that

other's motive, is given by the law, and guaranteed, fundamentally, a remedy against such other for at least the actual loss sustained, measured by legal rules. That applies, of course, to such torts as the one claimed to have occurred, giving rise to this case. *Duncan v. Klinefelter,* 5 Watts, 141.

The trial court held that there was, in legal effect, an arrest, because the officer was with the boy, had opportunity to take him into actual custody and did the equivalent thereto, since George, of his own motion, or by that of his father, chose to consider himself in official custody in order to avoid being taken from his home and imprisoned; the father agreeing, with his consent, to be responsible for his production on the following day to give bail according to law. Whether, as the trial court held, that amounted to an actual arrest, or whether the officer by having been induced as he was to rely upon *Mr. Schoettle's* promise, estopped the latter from subsequently efficiently claiming that George was not placed under arrest, is immaterial as we view the case. If it were conceded that the court was right on both propositions, the result would be the same as if the decision were otherwise. So it may be understood, for the case, that, to all intents and purposes, George was placed under arrest at his father's house and legal custody continued from that time till *Mr. Schoettle* breached his agreement by assisting his son to leave the sheriff's jurisdiction, unless the arrest ceased to be effective when the officer intrusted performance of his duty to *Mr. Schoettle* and took the risk of the latter not keeping his agreement.

At this point it seems appropriate, though not necessary, as we shall see in the end, to respond to plaintiff's appeal for condemnation of the trial court's refusal to grant a new trial as to *Holmes,* or decide the question of his responsible participation in *Mr. Schoettle's* wrongful conduct, if there were such, in plaintiff's favor and render a judgment against both defendants accordingly. We perceive no error in the fact that the special verdict was so framed as not to require an answer to

the question as to the participation of *Holmes* in the escape, so called, in case of failure to find that there was an arrest under the warrant. All hinged, at the best for plaintiff, on whether, actually or in practical effect, George was placed under arrest at his father's house. There was ample evidence, tending at least to show, that *Holmes* knew the whole situation when he. aided George to leave the sheriff's jurisdiction. There was either a jury question on that subject or not such because of the evidence being conclusive against *Holmes*. If the latter participated in the conduct of *Mr. Schoettle,* the two became thereby equally liable. Therefore, to change the answer which was vital to *Mr. Schoettle's* side, so as to find against him and then refuse a new trial as to *Holmes* or render judgment against him because of conclusive proof of his fatal connection with his codefendant, grounding the refusal upon the very reason which, if good, required a new trial, was illogical. So if the judgment is right as to *Mr. Schoettle,* it is wrong as to *Holmes,* requiring a reversal and new trial or judgment as to him. Further we will not go, on this branch of the case, as the whole subject will be superseded by what follows.

The law imposes very important duties upon sheriffs and similar officials and holds them to a very high degree of accountability. When a sheriff has a warrant, as in this case, he is in duty bound to execute it with all reasonable promptness by taking the defendant into official custody under it and holding him securely in such custody till he shall have been released by consent of the plaintiff, or be set at liberty upon giving bail according to the command of the writ and the written law as regards the manner and form thereof, or otherwise by due course of law. If, having reasonable opportunity to make the arrest, the officer fails to do so, he is liable to the plaintiff for the pecuniary loss, at least, sustained thereby. If he executes the warrant in part by taking defendant into custody and then loses such custody by escape, for any cause

within human control,—escape, voluntary or involuntary on his part, he is liable to the plaintiff the same as in case of a failure to execute the writ at all. Murfree, Sheriffs, § 199; Crocker, Sheriffs, §§ 600–607. The common-law doctrine in this regard is quite inexorable, and has not been relaxed in this state by statute as it has been in some jurisdictions, but has rather been supplemented here by written law. Sec. 2712, Stats. (1898). Without such relaxation the sheriff is liable for an escape, prejudicial to private rights, as in this case, within the limitations suggested even though there be no moral turpitude in the matter and only the constructive fault springing from legal responsibility for his act and the acts of his official assistants. We speak of this to illustrate the logic of the rule hereafter stated which particularly concerns this case.

True, an officer may, but at his peril, allow a defendant when under arrest on mesne process, some liberty contingent, however, upon his producing his prisoner on the return day of the writ or time equivalent thereto, if there be any; but if he permits the defendant to go at large for any length of time or illegally relaxes custody to any extent after making the arrest, whereby he is unable to produce his prisoner when required in the performance of his duty upon the return day of the writ, liability to the plaintiff for loss caused thereby arises and can be discharged only by payment of his damage.

A sheriff may entrust the execution of writs and the custody of persons taken thereunder to official assistants, being responsible for their conduct, as if it were his own. In case of their breaching official duty to his damage which he is compelled to meet, he has a right of action over against them for indemnity. This rule obviously goes no further than such assistants as are possessed of legal authority to arrest the defendant, or hold him by authority of the officer after initiation of legal custody. It does not permit of the officer entrusting custody of the prisoner to any one having no official right to restrain him, as a mere matter of convenience or indulgence.

It follows from the foregoing, that there can be no such thing as an escape, rendering a sheriff liable for an injury to private rights, as in this case, unless there was legal custody under the warrant at the time the departure occurred. That is too elementary to require support by authorities.

Now, it is not and could not be claimed there was any escape in this case in which the defendants, or either of them, wrongfully participated, from a legal standpoint, unless it occurred at the time George departed from the sheriff's jurisdiction. If he was not then in official custody, and had not been since he was voluntarily left with his father on the preceding day, then the escape, if any occurred, happened at the latter time.

From the foregoing it must follow, on principle, that a sheriff has no authority to leave his prisoner, as in this case, to be produced by a person having no official status and so no official right to restrain him. The contrary would be out of all harmony with the dignity and responsibility of the office of sheriff. It would open the way to lax performance of official duties and inestimable mischief, to the prejudice of private and public rights. No warrant is found in the history of the matter as found in the books for an officer to leave his prisoner with a private person under a promise of the latter to continue the custody, and be held excusable for doing so, or such person being held responsible to him upon such promise. The industry of counsel, if it were turned to the matter, failed to result in citing to our attention any precedent or principle sanctioning or enforcing such a promise. On the contrary, well considered decisions exist holding that such promises are void for want of consideration and are wholly unenforceable as contrary to public policy, being in violation of the official duty of the sheriff to take and officially hold, or let to bail, or release the defendant only according to the command of the writ.

We may well say, in passing, that the officer here did not even clothe *Mr. Schoettle* with the semblance of authority, by leaving the writ with him. Only copies were so left and that for the purpose of service, not for the purpose of conferring authority to restrain George as one under arrest. So there was a clear case, within principle and authority, of allowing a prisoner to go at large after having once been taken into custody under a writ,—go at large contrary to the command of the writ under which he was arrested.

Generally, it will be found stated, that any suspension of actual official custody once existing, as in this case, effects an escape. 11 Am. & Eng. Ency. of Law (2d ed.) 265. The officer, to perform his duty in such a case, must keep his prisoner in secure custody, not necessarily lock him up, but under official control. Murfree, Sheriffs, § 200. Leaving the prisoner in the custody of another, not an officer, as indicated, effects an escape necessarily, because of the custodian having no official authority to hold the prisoner. Crocker, Sheriffs, § 601; *Palmer v. Hatch,* 9 Johns. 329; *Browning's Ex'x v. Rittenhouse,* 40 N. J. Law, 230; *Hawkins v. Plomer,* 2 W. Blackst. 1048; *Benton v. Sutton,* 1 Bos. & Pul. 24; *Olmstead v. Raymond,* 6 Johns. 62.

Decisions of recent date relating to the subject are not numerous, rather indicating, when taken in connection with textbook authorities, that the stated rule long since became so elementary as to preclude controversies in respect to the matter reaching courts of last resort.

In connection with what has been said, it seems well to give caution against the inadvertent statement in Smith, Sheriffs, etc., at page 565, which might lead one astray. This language is there used: "Arresting one on civil process and leaving him in custody of one not an officer, is not an escape." Possibly that text-book statement was brought to the attention of the court below and affected the result, as it does not seem to have occurred that legal custody was suspended by the offi-

cer, because of his having left his prisoner with *Mr. Schoettle.* The quoted language is out of harmony with its context. It is based on two New York decisions which we have cited. They are directly contrary thereto. The word "not" evidently was interpolated into the author's writing in the process of producing his work after the copy for the printer left his hands. In the first case the author referred to the officer, after making the arrest, through kindness and for mutual convenience, left his prisoner in the custody of the latter's two brothers. The court treated the matter very briefly, thus: "This was leaving the prisoner at large and was clearly an escape; for the two brothers of the prisoner had no authority, after the deputy had left them, to detain the prisoner. . . ."

In *Benton v. Sutton, supra,* a leading English case often cited, the officer after making the arrest left his prisoner in custody, for a time, of a follower who had no official authority. The court by Eyre, C. J., said:

"The custody of the follower, after the writ once executed, amounted to nothing; he could have no power to detain the prisoner if he had chosen to escape, and the warrant would have been no justification to him, if any mischief had happened; which reduces the case to this point, that the prisoner was found absolutely at large. . . . Cases may be put where, if the officer attempted to justify any length of indulgence, under color of the prisoner being always in his presence, the court would say that it was an escape."

Buller, J., added:

"I think that no distinction can be made between such a case as this, and one which originates in more laudable motives. Wherever the prisoner in execution is in a different custody from that which is likely to enforce payment of the debt, it is an escape."

All the judges concurred that immediately upon the prisoner being, as matter of indulgence, left with the person not an officer,—who could have the protection of the writ in offi-

cially restraining him, he was no longer in legal custody, but, in the eye of the law, had escaped.

It follows, logically, from the foregoing,—upon the elementary principle that an agreement in plain violation of law, is unenforceable, and the time-honored doctrine that a sheriff holding a writ, as in this case, is in duty bound to execute it with strict fidelity to its commands; and that, after taking the prisoner, to place him under nonofficial control or allow him to go at large otherwise, upon his own promise or the assurance of another that he will appear at a later time, other than such assurance as is prescribed by law; any agreement whereby the officer entrusts custody of his prisoner to another who has not authority under protection of the writ to restrain him, accomplishes a legal escape,—that the agreement relied on was and is absolutely void.　The following in addition to the authorities heretofore cited so declare the law and illustrate its application: *Wheeler v. Bailey,* 13 Johns. 365; *Winter v. Kinney,* 1 N. Y. 365; *Cook v. Freudenthal,* 80 N. Y. 202; *Richardson v. Crandall,* 48 N. Y. 348; *Decker v. Judson,* 16 N. Y. 439.

In New York, it is true, a statute existed declaring agreements, other than such as are expressly authorized by law, taken by an officer in his official capacity to enable him to allow a person in his custody under arrest to go at liberty, void. But such statute was modeled after an ancient English statute and is, in the main, a declaration of a common-law rule.

In *Winter v. Kinney, supra,* it was said, in effect, that any agreement made by an officer inconsistent with his official duty whereby injury may happen to the plaintiff in the case in which the defendant is under arrest for the security of the plaintiff, is void.　Many cases are referred to in the citations of an officer taking a promise in some form not provided by statute, to enable him to allow the defendant more or less liberty inconsistent with his being under actual restraint as a

prisoner; the act in many, and perhaps most cases, as here, being out of kindness to the defendant and without thought of injuring the plaintiff or that he would be injured. All such were condemned as in breach of official duty.

In *Browning's Ex'x v. Rittenhouse*, 40 N. J. Law, 230, the court aptly remarked:

"There is little sentimentalism in the law relating to debtors in execution; and the rule is very stringent that the sheriff shall take the defendant and safely keep him so that he may have him in custody, ready to satisfy the plaintiff, though in arrests upon mesne process the officer discharges his duty if he produces the defendant on the day of the return."

We must assume, on the record, that the law of Michigan is the same as the law of this state respecting a sheriff's duty in such circumstances as those under consideration,—that is, to permit the prisoner to be at liberty after having been placed under arrest only upon his giving bail as indicated in the warrant, or the plaintiff consenting thereto, or the defendant being discharged or released in due course of law. The warrant in such a case fixes the amount of the bail. The statutes direct the manner thereof. Sec. 2697, Stats. (1898). They also provide that if the prisoner, after having been arrested, be not produced in due course, or have not given security in some one of the ways pointed out, the sheriff shall be liable, himself, as bail, upon the ground of having been guilty of permitting an escape. Sec. 2712, Stats. (1898). That is equivalent to a statutory prohibition of allowing a prisoner indulgence inconsistent with official duty and to a declaration that any such allowance, under an agreement, as in this case, is an escape and the agreement void.

How then can we escape the conclusion that the officer in taking, for the time being, the personal promise of *Mr. Schoettle* to produce George plainly violated the law, common and statute, regarding his official duty? The violation was of a

kind, regardless of good intention, deemed from time immemorial, as we have seen, of a very dangerous prejudicial character. Sound public policy condemns such lapses, no matter if the sheriff be actuated by the best of motives. Good motives do not, justify or excuse violation by a sheriff of his duty to as fully as practicable execute the writ placed in his hands for that purpose. A contract in breach of such duty is, logically, void and unenforceable.

We must hold that George Schoettle ceased to be plaintiff's prisoner before the time when he was assisted to leave the state of Michigan. There was a voluntary escape, in legal effect, the preceding day. *Mr. Schoettle* was under no legal obligation to produce his son and deliver him according to promise, however significant may appear his moral obligation to have done so. So George, not being in the sheriff's custody or under arrest in any sense on the day of the departure, committed no legal wrong to plaintiff in going away, neither did the defendants in assisting him in the matter.

The mere fact, if there be such, of there having been concert between the defendants did not create a liability for damages. In a civil action against two or more persons, charged with having conspired together to do a wrongful act to the damage of another and executed the agreement in that regard, the gist of the action is the damage, not the conspiracy. The latter is material only to fix joint liability when otherwise perhaps some of the parties charged would not be liable at all. If there be no legal wrong in what is done by such a combination then there is no legal, that is recoverable, damage. Such damages are only incident to a violation of some legal right. If the agreement between *Mr. Schoettle* and the deputy sheriff were valid, then the agreement between the defendants to breach it, and concurrence in carrying that out, would fall within the rule rendering concert in doing an unlawful act actionable civilly in case of the purpose of the agreement be-

ing carried out to the damage of another. The unlawful act, primarily, would be the breaking of the valid contract, not the concerting together to do it.

This court pointed out the danger of confusing conspiracy in its criminal aspect with conspiracy having no reference to the commission of a crime or not being in itself a substantive criminal offense, in *Martens v. Reilly,* 109 Wis. 464, 84 N. W. 840; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 254, 85 N. W. 1046; *Randall v. Lonstorf,* 126 Wis. 147, 105 N. W. 663; *White v. White,* 132 Wis. 121, 128, 111 N. W. 1116; and *Jones v. Monson,* 137 Wis. 478, 119 N. W. 179. As said in the latter case, there is no such thing as a civil action for conspiracy, but there is a well known right of action for damages for a wrong committed by many persons concerting together to do an unlawful act, the joint liability springing from the concert without, necessarily, all persons charged having participated in the overt acts. In *Martens v. Reilly, supra,* the rule on the subject, latterly several times approved, respecting the matter under discussion was phrased thus:

"An act legal in itself, in that it does not offend against the criminal law and the injuries are *damnum absque injuria,* regardless of its violation of moral standards, whether such act be the one perpetrated or the means used to that end, generally, if not the subject of a civil action for damages when done by one person, is not if done by many acting in concert."

We do not overlook the element of parental authority which existed in this case. That afforded capacity, to some extent, for *Mr. Schoettle* to keep his promise made to the officer, but under any one of many circumstances which might have arisen, none whatever. Parental authority gave *Mr. Schoettle* no legal right whatever to imprison his son as one liable to restraint as a violator of law, or to deprive him of his liberty for the purpose of turning him over to the officer. Regardless of such authority, the escape was complete and liability.

of the officer created when George was abandoned to nonofficial custody, leaving no basis for liability for what occurred on the following day. Had the writ been left with *Mr. Schoettle* it would not have furnished him any justification for resisting the taking of the boy on another writ held by some other officer or any other taking of George from his custody. All the authority incident to official control was due from the officer to the plaintiff in the action in which the writ issued. So far as he could, he violated his duty in that regard,—contracted away, innocently it is true, the custody which duty required him to retain, and then sought to recoup the damages he brought upon himself, through an action upon the void agreement. We may well say, in passing, that while he cannot succeed in doing that, the result reflects no credit on *Mr. Schoettle.*

The foregoing leaves the judgment without any support in the law or the evidence. The precise ground of our decision does not seem to have been presented below or to have been in the mind of counsel for appellant here, though the exceptions saved are broad enough to cover it so far as exceptions were necessary therefor. The judgment below should have gone in the defendants' favor on the motion therefor after verdict.

*By the Court.*—On plaintiff's appeal the judgment as to defendant *Holmes* is affirmed. On the appeal of defendant *Schoettle* the judgment is reversed, and the cause remanded with directions to enter judgment dismissing the action as to him with costs.

SIEBECKER, KERWIN, and BARNES, JJ., dissented.

A motion by plaintiff for a rehearing was granted on January 30, 1912, and the cause was reargued on April 6, 1912.

*E. D. Minahan,* for the plaintiff.

For the defendant there was a brief by *Miller & Reevs,* and oral argument by *S. S. Miller.*

The following opinion was filed April 23, 1912:

MARSHALL, J.   If George Schoettle was not at large,—had not already escaped from custody of the officer, when he was assisted by *Eugene Schoettle* and *Edmund Holmes* to leave the state, then the logic of the first result here requires a different one because of change of premises.

By common-law rules a person once arrested by mesne process, so long as kept within jail limits, is in official custody, and upon being permitted to go outside thereof without consent of the person at whose suit he should be in custody, there is a voluntary escape.   In general, a person arrested on mesne process may be permitted by the officer at his own risk to have jail liberties, or he may take a bond to indemnify against risk in permitting the indulgence.   In either case, there is no escape.   Such is the common-law rule,—Crocker, Sheriffs, § 592; 11 Am. & Eng. Ency. of Law (2d ed.) 269,—and it has been incorporated into most Codes in connection with a variation of the common rule as to what constitutes jail limits. That is true as to our statute.   Secs. 4321–4323, Stats. (1898).

So it is important in a case of this sort, to determine the state of the law in the particular jurisdiction where the cause of action arose as regards what constitutes jail limits.   Commonly it is the prison bounds.   In the absence of any statute that would be the test.   In case of a suit prosecuted, as in this instance, and no proof of a statute fixing jail limits in the neighboring state, the presumption would be that they are the same as here,—the sides of a square, the center of each side being one mile from the jail.

It follows that, under the common law or the statutes of this state, George Schoettle, after having been arrested, was permitted to be outside of jail liberties and from under official custody.   That seemed fatal to plaintiff's cause of action

on the first hearing. The aspect would have been the reverse had it been understood that under the law of Michigan George Schoettle was within jail liberties till he departed from the county wherein he was arrested.

The vital point of the case does not appear to have been fully appreciated when the cause was first presented here. The statute of Michigan, which governs the matter, was not referred to by either side, in the briefs or oral arguments. The record of the trial did not clearly disclose introduction of the statute. Looking through that part of the bill of exceptions where one would expect to find evidence of its introduction, it is not clearly there. It appears, *in extenso,* with a copy of all statutes introduced at the end of the bill. Counsel now seem to agree that it was introduced in evidence. The main contention of counsel for defendants is that it was not competent because not pleaded. It is considered that there is no merit in that. It was mere matter of evidence to prove a fact essential to the cause of action. The fact was pleaded. Of course, it was not necessary to plead the evidence to prove the fact.

Why the Michigan statute which now seems so vital and would certainly have seemed so before had it been brought to our attention, was not mentioned in the briefs and made prominent on the argument, is not perceived. Under the circumstances, particularly the state of the record, it seems quite natural that it escaped our attention.

Sec. 8912, How. Ann. Stats. Mich. 1882, fixes the jail limits in that state at the boundaries of the county within which the jail is situated and provides that a person under arrest, as in this case, shall be entitled to the liberties of the jail limits of such county, upon executing a bond to the sheriff, as indicated; and sec. 8919 of such statutes provides that

"The going at large of any prisoner who shall have executed such bond, or of any prisoner who would be entitled to the

liberties of any jail upon executing such bond, within the jail limits of the county in which he shall be in custody, shall not be deemed an escape of such prisoner, but in case any such prisoner shall go at large without the jail limits of such county, without the assent of the party at whose suit such prisoner shall be in custody, the same shall be deemed an escape and forfeiture of the bond so executed, and the sheriff in whose custody such prisoner shall have been, shall have the same authority to pursue and retake such prisoner, as if such escape had been made from the jail."

The effect of the foregoing is unmistakable. It, in legal effect, extended the prison bounds so as to make them coincide with the bounds of the county within which it is situated. So long as a prisoner remains within the county he is in the legal custody of the sheriff, the same as if confined to the bounds of the jail under the rules of the common law. For one so circumstanced to leave the county without the assent of the person at whose suit he is under arrest, is just as much a wrong as if he broke and escaped from jail limits as that term was used in ancient law.

It follows that, when George Schoettle broke his parole, so to speak, by departing from his county, he committed a wrong to the damage of the plaintiff, *Gebhardt*. The damage drew to the cause of action for the wrong all persons who participated in its commission. That element, the combination to induce and aid the prisoner to escape from the officer's constructive custody and the execution of the purpose of the combine, under the rules referred to in the former opinion, made a good cause of action in *Gebhardt's* favor against the co-conspirator for damages.

Thus the law of the case, as before decided, is so varied by the statutes of the state of Michigan, where the cause of action arose, that the judgment against *Eugene Schoettle* is right and must be affirmed; that the judgment as to defendant *Holmes* must be reversed, and the cause remanded with direc-

tions to amend the judgment in plaintiff's favor so as to be against both defendants.

*By the Court.*—So ordered.  Costs in this court to go in plaintiff's favor on both appeals.

All Justices concurred.